# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                          Criminal No. 05-CR-434
                                                   (JNE/SRN)

        Plaintiff,

        v.                                 <u>REPORT AND RECOMMENDATION</u>

Alejandro Rodriguez Gallegos (1),
Julio Cesar Lopez (2)

        Defendants.

---

Nate Petterson, Esq., on behalf of Plaintiff

Alberto Miera,  Esq., on behalf of Defendant Alejandro Gallegos

Thomas Plunkett, Esq., on behalf of Defendant Cesar Lopez

---

SUSAN RICHARD NELSON, United States Magistrate Judge

        The above entitled matter came before the undersigned United States Magistrate Judge on

Defendant Gallegos's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 47); Defendant Gallegos's Motion to Suppress Evidence Found on Defendant's Person (Doc. No. 48); Defendant Gallegos's Motion to Suppress Statements, Admissions and Answers (Doc. No. 49); Defendant Lopez's Motion to Suppress All Statements (Doc. No. 13); Defendant Lopez's Motion to Suppress Physical Evidence (Doc. No. 15); Defendant Lopez's Motion to Suppress All Evidence Obtained Pursuant to the Execution of a Search Warrant (Doc.

1

No. 27); and Defendant Lopez's Motion to Dismiss Based on Entrapment/Notice of Intent to Raise Defense of Entrapment (Doc. No. 32). [1]

This matter is set to be tried before the Honorable Joan N. Ericksen, United States District Court Judge for the District of Minnesota, on a date to be determined. This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I.    FACTS

An Indictment was filed on December 20, 2005, charging each defendant with one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). (Indictment, Doc. No. 1.)

The following witnesses, all members of the Minneapolis Police Department, testified for the Government at the criminal motions hearing: Officer Justin Merten, Sargent Daniel Pommerenke and Officer Blaine Lehner. Defendants Gallegos and Lopez testified in their own defense.

The Court received the following exhibits in evidence:

(A)    Government Exhibit 1: Application for search warrant of residence and vehicles, supporting affidavit, search warrant, receipt, inventory and return of search warrant;

(B)    Defense Exhibit 1: Photograph of residence, looking east;

(C)    Defense Exhibit 2: Photograph of residence, looking west;

(D)    Defense Exhibit 3: Photograph of rear yard of residence, looking north;

---

[1]Defendants' non-dispositive motions were addressed in a separate Order.

(E)     Defense Exhibit 4:  Photograph of residence, looking through back door;

(F)     Defense Exhibit 5: Cassette tape recording of Defendant Gallegos's interview;
        and

(G)     Defense Exhibit 6: T-shirt.

(Doc. No. 62, Criminal Motions Hearing Exhibit and Witness List.)

**A.     Surveillance**

Officer Justin Merten testified that around noon on October 18, 2005, he was in the South

Minneapolis neighborhood of the residence in question, having received information about an

unrelated property that was possibly involved in cocaine trafficking.  Officer Merten was alone,

in plain clothes, traveling in an unmarked car.  While conducting surveillance in the alley, he

observed a black Suburban pulled off to the side of the alley, not parked in a driveway.  He also

observed that the vehicle was occupied for approximately ten minutes.  Officer Merten was

suspicious that this might signal a possible drug buy, because of the way in which the vehicle

was parked, the fact that it was occupied and because it was situated in what he characterized as

a high-crime area.  He observed a person exit the Suburban and walk to the residence in

question.  He described this person as a Hispanic and/or Mexican male, in his 20's,

approximately 5' 9", of light complexion.  Officer Merten testified that he observed this man

from a distance of approximately six residents' yards.  Because his suspicions had been aroused,

Officer Merten followed the Suburban, which exited the alley shortly after the Mexican male left

the vehicle.

The Suburban traveled to the area of East 27th Street and 16th Avenue South.  Officer

Merten stated that the driver drove in a manner consistent with a person seeking to evade law

enforcement, i.e., stopping at unusual locations, such as mid-block, to determine if he was being followed, turning abruptly without signaling and turning into a parking lot and quickly exiting. Officer Merten directed a marked squad car to stop the vehicle.  A search of the vehicle produced a gun and narcotics, including ecstasy, marijuana and cocaine.  That same day, Officer Merten interviewed the driver of the Suburban and tape recorded the interview.  The driver stated that he was in the area to purchase marijuana from the Mexican male from whom he had previously purchased one-pound quantities of marijuana for resale at this address.  He did not provide a name for this supplier.  The driver of the Suburban further indicated that he had planned to return to the same residence to sell his gun to the supplier and to pay him for the marijuana.

B.     "Knock and Talk"

Officer Merten testified that he returned to the residence in question approximately four to five hours later to try to follow up with the residents, which officers refer to as a "knock and talk."  Officers Nimlos, Kaneko and Lehner accompanied him, as did Sargent Pommerenke; all of them were dressed in plain clothes.  Officers Merten, Lehner and Sargent Pommerenke each testified about the knock and talk.  Sargent Pommerenke testified that based on citizen complaints about possible drug trafficking, police officers had attempted direct drug purchases from the residence throughout the summer, but had been unsuccessful.

According to Officer Merten, the officers approached the residence in question at approximately 6:00 p.m., arriving in the rear of the residence.  Officer Merten observed a person who matched the appearance of the person he had seen earlier that day, later identified as Defendant Gallegos.  Defendant Gallegos accessed the interior of the passenger compartment of

4

a silver GMC Denali, which was parked in the rear driveway of the residence.  He then

proceeded toward the rear of the residence.  At this point, officers indicated that they wished to

speak with him.  Officers provided conflicting testimony as to who initiated contact and what

precisely was said, but agreed that an officer initiated verbal communication with Gallegos and

identified himself as a police officer.  No guns were drawn and the officers made no demands on

Gallegos.

Officer Merten testified that in response to this contact, Gallegos continued moving

toward the back door and entered the house.  The officers' testimony differs as to the manner in

which Defendant Gallegos proceeded, i.e., whether he ran or sprinted,  walked backwards, or

walked quickly and looked over his shoulder, but they do agree that Gallegos moved toward the

residence and entered it.

Officer Lehner testified that he saw Defendant Gallegos enter a common area in the

house, which he could observe through the open back door because it was well-lit.  Although he

was still in the backyard, Officer Lehner testified that he saw Gallegos inside the house with a

handgun in his hand.   Sargent Pommerenke testified that he observed Gallegos pull a gun from

his waistband upon entering the house.  Officer Lehner testified that at this point, officers did not

know what Gallegos intended to do with the gun, e.g., if he planned to take a hostage inside the

house or use the gun to protect himself.  Officer Lehner stated that he loudly yelled, "Gun!"

Sargent Pommerenke testified that it was he who alerted his fellow officers to the gun.  In any

event, Officer Lehner pulled out his own gun and ran to the front yard.   He testified that he

smelled marijuana while running around the side of the house.  Officer Merten likewise testified

that he ran to the front of the house.  He did not personally observe the gun and learned of the

gun from Officer Lehner, when both were in the front yard.   Meanwhile, Sargent Pommerenke and another officer ran through the house in pursuit of Defendant Gallegos.  Sargent Pommerenke testified that he smelled a strong odor of marijuana and observed another male in the residence.

Defendant Gallegos ultimately exited the residence through the front door.  Officer Lehner testified that he saw Gallegos outside the front of the house, standing on some steps. Officer Lehner stated that Gallegos had a gun in his hand, which he then placed in his waistband. Officer Lehner drew his gun and ordered Gallegos to get on the ground.  According to Officer Lehner, Gallegos hesitated, so Officer Lehner pushed him and he fell down.  After placing him in an arm bar on the ground and securing him, Officer Lehner ordered Gallegos to get up.  When Gallegos failed to do so, Officer Lehner pulled him down the steps, at which point Gallegos's gun fell out of his pants, according to Officer Lehner.  Officer Merten, however, testified that he saw Officer Lehner remove the gun from Gallegos's waistband during a pat search.

As Officer Lehner conducted a pat search of Gallegos, he felt a hard, round object in Gallegos's coin pocket, which he removed.   The object later tested positive for cocaine.

Inside the house, Sargent Pommerenke secured another occupant in the house, then he and another officer conducted a protective sweep, searching for additional persons in the residence.  Sargent Pommerenke testified that he entered the open basement and announced that he was a police officer.  In a makeshift bedroom near the foot of the stairs, Sargent Pommerenke observed a substance that he believed to be cocaine in plain view on top of a dresser as well as what appeared to be a plastic kilo wrapper on the nearby bed.  According to Sargent Pommerenke, he pulled back sheets and blankets to ensure that no one was hiding.  He also

testified that he leaned up against the mattress, pushing it back, in order to push back the blankets.  When he pushed back the mattress, he discovered a gun.  Officers also checked the interior of the GMC Denali and a minivan on the property to ascertain whether they were occupied.  No persons were inside either vehicle, though officers detected suspected drug residue of marijuana on the dashboard of the minivan parked in the back, as well as drug wrappers in the back.

Sargent Pommerenke then decided to "freeze" the house and dispatched Officer Merten to obtain a search warrant.

### C.      Search Warrant

Sargent Pommerenke stated that while Officer Merten left to obtain a search warrant, he "froze" the house and all of the remaining officers – Nimlos, Kaneko and Lehner – secured the property, remaining at the dining room table, or certainly within sight of each other.   Officer Lehner, however, testified that during the wait for the warrant, he went to the basement, 'not for any real reason.'[2] While in the basement, he observed the cocaine on the dresser.  Officer Lehner stated that 'I wandered around, I looked at things in plain view, but did I search [the house] before a search warrant was signed?  No.'

The warrant was signed on October 18, 2005, by the Honorable Patricia Belois, Hennepin

---

[2]At the criminal motions hearing, the following exchange took place between Defendant Lopez's counsel, Mr. Plunkett,  and Officer Lehner:

Q:      So you walked around the house, looking around the house before the warrant got there, correct?
A:      You get bored.
Q:      Did you guys also order a pizza while you were there?
A:      Uh, I think we did, yes.

County District Court Judge.  (See Govt. Ex. 1, Search Warrant.)  The affidavit, prepared by

Officer Merten, set forth the events involving his initial surveillance and the knock and talk.  The

warrant sought permission to search for various items including narcotics and related

paraphernalia, firearms, ammunition, and radio and telecommunication devices.  (Id.,

Application.)  Officers executed the warrant and obtained evidence including drug wrappers, a

large quantity of suspected cocaine, quantities of suspected marijuana and guns.  (Id., Receipt,

Inventory and Return.)

### D.   Testimony of Defendants

As noted above, both Defendants testified at the criminal motions hearing.

### 1.   Defendant Gallegos

Defendant Gallegos described his background, growing up in Bloomington, Minnesota,

and attending Southwest High School.  While in high school, he "hung out" with Soreno Gang

members and moved to get away from them.

Gallegos testified that on October 18, 2005, around noon, he was not at the residence in

question.  Instead, he was at home with his parents.  He did visit the residence later that day,

around 4:00 pm., in order to purchase cocaine from a person named Juan Flores, whom he had

known for approximately two weeks.  During that time period, Gallegos had purchased one

ounce of cocaine from Flores and Flores also gave him the quantity of crack found in his coin

pocket during the pat search.  Flores lived in the house, in the basement, and possessed a

quantity of cocaine located there.  Defendant Gallegos called Juan Flores from his cell phone,

asked if he could "get something," and Flores allegedly instructed him to take some cocaine

from a larger amount stored under the bed in the basement.  Gallegos testified that he wanted

8

two ounces of cocaine.  Flores told Gallegos to weigh the kilo of cocaine under the basement

bed.  Gallegos testified that he placed the entire quantity of cocaine on the dresser and

repackaged it into three to five smaller bags.  Rather than take his two ounces and go, Gallegos

waited for Flores to return so that he could pay him for the cocaine.  He testified that the agreed

upon price was $700 an ounce and that he had $1500 in his wallet.  Gallegos testified that he

intended to resell the two ounces.

While waiting for Flores, Defendant Lopez invited Gallegos to stay and watch a movie.

At approximately 6:00, he went outside the house to retrieve a DVD and his glasses from the

Denali.  He stated that at no time did he have a gun in his hand, but that it remained in his

waistband.   Instead, the DVD and glasses remained in his hands. When officers approached him

and indicated that they wished to talk to the man of the house, Gallegos said that he was not the

owner of the house, but that he would call him.  He then went inside the house.  Once inside,

Gallegos told Defendant Lopez that police officers were in the backyard and wanted to talk to

him and that Gallegos wanted to leave.  On cross examination, Gallegos stated that it did not

occur to him to dump the gun in the house, instead, it remained in his waistband and was never

in his hands.  Gallegos exited via the front porch, finding officers in the front.   Another person,

Miguel, was outside and Defendant Lopez was still inside, but near the front door. According to

Gallegos, he still had the DVD and glasses in his hands, which he dropped when he was told to

hit the ground.  The gun, however, remained in his waistband.   He acknowledged that of the

persons in the immediate area, the officers focused on him.

He testified that officers handcuffed him and dragged him down the stairs, at which point

the gun fell out of his waistband.   Gallegos stated that this was the first time that officers saw

the gun and any testimony to the contrary is a lie.

He testified that at the scene, Officer Merten escorted him downstairs to the basement, showed him the drugs on the dresser and asked about them.  When officers asked to whom the large quantity of cocaine belonged, he told them.  On cross examination, Gallegos stated that of the occupants of the residence, only he was taken to the basement.  On cross examination, Gallegos admitted to seeing the cocaine on the dresser, exactly where he had placed it himself, and acknowledged that it was in plain view.  Gallegos indicated that all of the officers were present in the basement.  He stated that he had not been read his rights at the time.  Gallegos further testified that at the house, officers told him that if he accepted responsibility for his actions, he might get a better deal.  If he refused to talk to them, Gallegos testified, the officers told him that he would get more time.

As to the crack cocaine found in his right coin pocket, Gallegos testified that Flores gave it to him for his personal use a few days earlier.

He testified that prior to his tape recorded interview, Officer Merten said words to the effect of, 'If you don't cooperate, you'll get more years.'   On cross-examination, Gallegos conceded that he could have referred to the offer of an alleged deal on tape, but did not do so.

### 2.    Defendant Lopez

Defendant Lopez testified that when Gallegos re-entered the house around 6:00 p.m. on October 18, 2005, Gallegos told him that police wanted to talk to the man of the house.  Within seconds, Gallegos walked quickly out the front door.  Lopez likewise went to the front door. With Gallegos already outside, Lopez stated that he was between the house and the door, when at gunpoint, officers told him to freeze.  He complied and officers handcuffed him.  Lopez

testified that Officer Lehner went straight for Gallegos and punched him in the chest.  According to Lopez, he only became aware of a gun when Defendant Gallegos was dragged down the stairs and the gun fell out.  He testified that neither he nor Miguel, the other person nearby, were dragged down the stairs.  In Lopez's opinion, the officers appeared surprised to see a gun and Officer Merten allegedly stated, "Now we have a reason."

### E.      In-Custody Interview of Gallegos

Officer Merten testified that he and Officer Nimlos conducted an interview of Defendant Gallegos the following day, October 19, 2005.  (See Defense Ex. 5, Cassette Tape of Interview.) Officer Merten advised Gallegos of his <u>Miranda</u> rights and Gallegos indicated that he understood his rights and agreed to talk to the officers.  During the interview, Gallegos discussed the events leading to his arrest.  Specifically, he stated that he was at the house to purchase two ounces of cocaine from Juan Flores, who was not at home.  Per Flores's instruction, he retrieved a brick of cocaine from under the basement bed and removed the wrapper, placing it on the bed.  With the brick of cocaine on the dresser, he weighed it and began to repackage it.    At no time during the interview did Defendant Gallegos ask for an attorney or ask that the interview be terminated. The interviewing officers made no threats or promises to Defendant Gallegos.

## II.      DISCUSSION

### A.      Suppression of Evidence Obtained as a Result of Search and Seizure

Defendants move for an Order suppressing any physical evidence obtained as a result of the search and seizure on October 18, 2005.  They argue that the search was unlawful, in that it was conducted without a valid warrant, without probable cause and absent exigent circumstances.    Defendants contend that any evidence seized was the result of an unlawful

search.

### 1.     Defendant Gallegos's Expectation of Privacy in the Residence

As an initial matter, the Court addresses whether Defendant Gallegos has a reasonable expectation of privacy in the residence in question.  Defendant Gallegos was not a resident of the searched premises and was there, by his own admission, to purchase cocaine.   Similar facts were before the Supreme Court in Minnesota v. Carter, 525 U.S. 83 (1998).  Citing its earlier decision in Rakas v. Illinois, 439 U.S. 128, 143 (1978), the Court noted that in order to claim the protection of the Fourth Amendment, "a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable . . . ." 525 U.S.  at 472.  Applying this analysis to the facts of the case, the Court held that defendants visiting an apartment for only two and a half hours in order to package cocaine had no legitimate expectation of privacy in the apartment, therefore, the Fourth Amendment provided them no protection.  Id. at 473-74.

In reaching its ruling, the Court noted that while the text of the Fourth Amendment suggests that it extends only to people in "their" houses, an overnight guest has a legitimate expectation of privacy in a host's home.  Id., citing Minnesota v. Olson, 495 U.S. 91 (1990). The Supreme Court also noted that property used for commercial purposes, including the sale of narcotics, is treated differently for Fourth Amendment purposes.  525 U.S. at 474.  Thus, the Court stated, "[T]he purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder, all lead us to conclude that respondents' situation is closer to that of one simply permitted on the premises."  Id.  The Court therefore concluded that the

defendants had no expectation of privacy in the apartment, and thus, any search did not violate their Fourth Amendment rights.

The Eighth Circuit reached the same conclusion in <u>United States v. Sturgis</u>, 238 F.3d 956, 958-59 (8th Cir. 2001), <u>cert. denied</u>, 534 U.S. 880 (2001), holding that a defendant who visited another's motel room for the commercial purpose of distributing illegal substances, lacked a reasonable expectation of privacy in the motel room and therefore lacked standing to contest its search.

Here, Defendant Gallegos was not an overnight guest. While he testified that he intended to watch a movie while he waited for Juan Flores to return, his primary purpose at the residence was to purchase two ounces of cocaine from Flores, who lived there. Gallegos stated that he phoned Flores prior to arriving at the residence and then again when he arrived. Flores told him where the cocaine was located and asked him to weigh it. Gallegos testified that he arrived around 4:00 p.m. At approximately 6:00 p.m, the officers arrived. While Gallegos may have had some previous connection with Defendant Lopez, he testified that he had known Juan Flores for only two weeks. The relationship centered on Flores's sale or provision of cocaine to Gallegos. Defendant Gallegos, by his own admission, visited the residence for the commercial purpose of purchasing cocaine and was there a relatively short time period of two hours. Thus, this Court concludes that the situation here is analogous to <u>Carter</u> and that Gallegos has no reasonable expectation of privacy in the place searched and no standing to contest the search of the residence.

## 2.    Protective Sweep

In any event, this Court must analyze the validity of the search and seizure on the merits

because Defendant Lopez, who was a resident of the searched property, has likewise challenged

the search.  Both Defendants contend that the protective sweep of the house was impermissible,

that there was no probable cause for the issuance of a search warrant, and no exigent

circumstances justified the search.

While in general, an arrest does not justify a full-blown search of the arrestee's home,

see Chimel v. California, 395 U.S. 752, 763 (1969), in Maryland v. Buie, 494 U.S. 325, 334

(1990), the Supreme Court has held that officers may conduct a limited protective sweep

following an in-home arrest if they have a "reasonable belief based on specific and articulable

facts that the area to be swept harbors an individual posing a danger to those on the arrest scene."

While this is to be a cursory inspection of limited duration, items in plain view may be seized

during such a protective sweep.  Id. at 330 (seizure of distinctive clothes in plain view during

protective sweep valid because officers had probable cause to believe clothes were evidence of

crime.)

Defendant Lopez argues that the search was simply conducted out of hand, rather than

based on any reasonable suspicion supported by articulable facts that others might be hiding on

the premises.  In addition, he notes that because the arrest of Defendants took place on the porch,

rather than inside the house proper, a protective search of the entire premises was overreaching

under Buie.

While the testifying officers' accounts are conflicting in some respects, the Court finds

the officers' testimony is more credible than the Defendants' testimony.  The officers' testimony

sufficiently establishes that they had reasonable suspicion, based on articulable facts, that others

might be hiding on the premises.  Officer Merten witnessed a drug transaction on the premises

earlier in the day.  After having arrested and interviewed the buyer, officers learned that the

buyer intended to return to the house later that day to pay for the marijuana he had acquired and

to sell a gun.  When he arrived on the scene for the knock and talk, Sargent Pommerenke

recognized the house, as it had previously been the scene of unsuccessful, attempted undercover

drug buys.   Thus, officers reasonably believed that the house was involved in illegal drug

distribution and they could infer that the occupants might be armed.

In addition, at least two officers testified that they saw Defendant Gallegos with a gun in

his hand inside the house.   The officers' testimony is more credible than that of Gallegos, who

claims that officers could not have seen the gun until after he was arrested.  While Officer

Lehner did not see the gun until later and the other two officers have slightly different accounts

of when they saw the gun, the fact remains that Defendant Gallegos possessed a loaded gun on

his person. Having created the exigent circumstance himself by turning away from the police and

producing a gun, officers pursued and arrested Gallegos.

As to the protective sweep, Sargent Pommerenke testified that he pulled back blankets on

the bed in the basement in order to determine if any persons – adults or children – were hiding.

Also, while pursuing Gallegos inside the house, officers noticed at least one other person inside.

Based on all of these observations, the officers therefore possessed a reasonable belief based on

articulable facts that the house might harbor additional persons posing a danger to those on the

arrest scene.

Based on the prior knowledge regarding the drug activity at the residence, the strong odor

of marijuana at the residence, the fact that officers arrested Gallegos on the front porch in

possession of a handgun, and that at least one other person was inside the house, the officers had

sufficient reason to conduct a protective sweep.

Defendant Gallegos cites the Fifth Circuit decision, <u>United States v. Vega</u>, 221 F.3d 789 (5th Cir. 2000), <u>cert. denied</u>, 531 U.S. 1155 (2001), to support his argument that no exigent circumstances justified the search.   In <u>Vega</u>, a Brownsville police officer received a tip that three armed persons would be driving through Brownsville in a dark sedan with Florida license plates carrying a large amount of cash to purchase narcotics. Police followed the car and observed the suspects enter a residence.  They did not observe any illegal activity, but based on the tip, an officer approached the house and sought the owner's consent to enter and search for weapons and narcotics.  <u>Id.</u> at 794.  One of the officers saw someone inside move quickly to the back of the house.  Vega, aware of the officers' presence, exited through the back door of the house and was arrested while attempting to go into a nearby alley.  Meanwhile, an officer heard movement inside the house and conducted a protective sweep in order to protect the safety of his fellow officers.  <u>Id.</u>

The Fifth Circuit held that the protective sweep was invalid because the officers themselves had created the exigent circumstances giving rise to the sweep.  <u>Id.</u> at 798-99. Without justification, the officers abandoned their surveillance positions and took action that they believed would give the suspects cause to retrieve weapons or dispose of drugs.  <u>Id.</u> at 800. The suspects were unaware of police surveillance, nor did they attempt to leave the premises with drugs or try to dispose of drugs.  <u>Id.</u>  None of the officers had "seen any signs that these as yet unknown men possessed any drugs, money, or weapons."  <u>United States v. Jones</u>, 239 F.3d 716, 721, n.3 (5th Cir. 2001) (distinguishing <u>Vega</u>), <u>cert. denied</u>, 534 U.S. 861 (2001).

Here, unlike the situation in <u>Vega</u>, officers observed Defendant Gallegos in possession of

a weapon before they entered the house.  Gallegos – not the police officers – created the

exigency.  As Officer Lehner testified, the officers had no way of knowing if Gallegos intended

to harm someone inside the house or use the weapon against the officers.   Thus, the Fifth

Circuit's decision in Vega, is distinguishable from the facts of this case.

Defendant Lopez contends that the scope of the sweep was overly broad, arguing that an

officer easily could have stood in the back of the house, guarding the back stairs, as opposed to

searching the entire basement.  Addressing the permissible scope of a protective sweep, the

Eighth Circuit has held that a protective sweep of an upstairs bedroom was reasonable, even

though the suspect had been handcuffed and taken downstairs, because marshals had no way of

knowing how many people were in house when they entered it, the search was quick and limited,

and it was initially confined to places large enough to conceal a person.  United States v. Boyd,

180 F.3d 967, 975-96 (8th Cir. 1999)  Likewise, in United States v. Jones, 193 F.3d 948, 950 (8th

Cir. 1999), the Eighth Circuit concluded that after officers pursued and apprehended a man in an

apartment building who had brandished a firearm at them, a protective sweep of the building was

permissible.  The officers reasonably could have been concerned for their safety; the man's quick

retreat into the building reasonably could have been construed as an effort to get help or to warn

others; and a rifle seen behind a screen door could have signaled to a reasonable mind the

presence of another potential assailant, though the two immediately obvious guns had been

confiscated, and though armed police officers were outside, on the other side of the building.  Id.

In contrast, the Eighth Circuit has held that police officers' entry into an office in the

basement of house, as part of protective sweep of house while serving a protective order, a non-

arrest situation, was not justified.  United States v. Waldner, 425 F.3d 514 (8th Cir. 2005).  Even

though officers knew that the defendant might possess weapons, there was no indication that an

unknown individual might be in the office, or anywhere else in the house, ready to launch an

attack.  Id. at 517.

Here, Officer Lehner testified that upon seeing the gun as Defendant Gallegos entered the

house, the officers had no idea if a possible hostage situation might occur, if he would launch an

attack on the officers or harm himself.  Sargent Pommerenke observed another person inside the

house as he pursued Defendant Gallegos.  While Sargent Pommerenke agreed that posting an

officer in the back of the house was a possible precaution to have taken, the officers acted within

the scope of the law by conducting a protective search of the basement.

The evidence observed in plain view during the sweep – specifically, the cocaine on the

basement dresser – could therefore properly be included in the affidavit for the warrant.

### 3.  Probable Cause

Defendants contend that the search of the premises was conducted without probable

cause.  The Court therefore turns to the inquiry of whether the "four corners" of the warrant

affidavit supplied a substantial basis for concluding evidence of wrongdoing would be found in

the place to be searched.  The standards for this inquiry are familiar and important.

"It is well-established that courts may *not* look to facts outside the affidavit in

determining the existence of probable cause," United States v. Martin, 833 F.2d 752, 757 (8th

Cir. 1987) (Lay, C.J., concurring), cert. denied, 494 U.S. 1070 (1990); rather, "'only that

information which is found within the four corners of the affidavit may be considered in

determining the existence of probable cause.'" United States v. Etheridge, 165 F.3d 655, 656

(8th Cir. 1999).

"Probable cause exists if, based upon a common-sense consideration of all the circumstances set forth in the supporting affidavit, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Curry, 911 F.2d 72, 75 (8th Cir. 1990) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."  Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978).

Importantly, "[f]inely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision" whether a showing of probable cause has been met.  Illinois v. Gates, 462 U.S. 213, 235 (1983).  Rather, "'in dealing with probable cause, . . . as the very name implies, we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  Id. at 231 (citations omitted).

"[T]he preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination" as to the existence of probable cause.  United States v. Leon, 468 U.S. 897, 914 (1984); accord Gates, 462 U.S. at 236-37.  In this regard, this Court does not make a de novo review of the sufficiency of the affidavit.  Gates, 462 U.S. at 236; accord United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986) ("[A] district court should not make a de novo determination of probable cause . . . .").  Rather, "the decision to issue the warrant is to be upheld if supported by substantial evidence in the record," Reivich, 793 F.2d at

19

959, or, in other words, "so long as the [issuing Judge] had a 'substantial basis for . . .

conclud[ing]' that a search would uncover evidence of wrongdoing." <u>Gates</u>, 462 U.S. at 236.

Moreover, a court "may properly rely on normal inferences drawn by the surrounding

circumstances and the allegations of facts contained in the affidavit." <u>United States v. Carlson</u>,

697 F.2d 231, 238 (8th Cir. 1983).

      Officer Merten's affidavit supplied probable cause for the issuance of a warrant. First,

the only information in the search warrant that was derived from the protective sweep was the

officers' observation of a kilo quantity of suspected cocaine on top of a dresser in the basement.

(Govt. Ex. 1, Application for Search Warrant.) As noted, this Court has concluded that the

protective sweep was valid. The additional probable cause found in the application includes the

observed drug deal at the premises earlier in the day, the information from the buyer about his

regular purchases of marijuana at this residence, Gallegos's arrest at the premises with a loaded

gun on his person and a baggie of cocaine in his pocket, and the plain view observation of

suspected marijuana on the dashboard of a vehicle parked behind the premises. <u>Id.</u>

      Given the foregoing, the Court finds that all of the information viewed in totality formed

a substantial basis for concluding that there was probable cause (a fair probability) to believe that

the places to be searched, listed in the warrant, would uncover evidence of illegalities as to both

Defendants.

**4.      Execution of the Search Warrant**

      Defendants challenge the execution of the warrant, arguing that the search was executed

in an illegal and unlawful manner, and not in good faith.

Police generally may not exceed the terms of the authorizing warrant when conducting a search.  See Marron v. United States, 275 U.S. 192, 196-97 (1927).  If executing officers exceed the scope of a search warrant, the seized evidence may be suppressed.  See, e.g., United States v. Schroeder, 129 F.3d 439, 442 (8th Cir. 1997).

First, officers testified that they did not conduct a search until Officer Merten had procured a search warrant.  Despite Officer Lehner's "frolic and detour," as Defendant Lopez characterizes the officer's "wandering" during the wait, both Officer Lehner and Sargent Pommerenke testified that nothing was searched until the warrant arrived.  Defendant Gallegos himself admitted that the kilo quantity of cocaine was found exactly where he had placed it. The inventory of items seized comports with the list of items to be seized, for which the affidavit provides sufficient probable cause. (See Govt. 1.)

"And, even if we thought the warrant affidavit did not establish probable cause, the good faith exception to the warrant requirement would apply because the affidavit was sufficient to allow an officer to reasonably believe probable cause existed."  United States v. Johnson, 219 F3d 790, 791 (8th Cir. 2000) (citing United States v. Leon, 468 U.S. 897, 923 (1984)). Furthermore, there is absolutely no indication that the issuing judge, the Hon. Patricia Belois, abandoned her judicial role, that Officer Merten knew of the falsity or was reckless with regard to the truth of anything in his affidavit, that the warrant was facially deficient, or that the warrant was so lacking in probable cause as to render official belief in it unreasonable.  See generally United States v. Leon, 468 U.S. 897, 923 (1984) (explaining when the good faith exception does not apply); see also United States v. Gibson, 928 F.2d 250, 253-54 (8th Cir. 1991) (finding that the Leon good faith exception applied on a showing of probable cause much less than that

21

exhibited here).

Accordingly, Defendants' motions to suppress based on the execution of the warrant should be denied.

### C. Suppression of Evidence Based on Unlawful Arrest

Defendant Lopez argues that his arrest was conducted without the authority of a valid arrest warrant and without probable cause.  He also contends that all items seized from him "were as a result of duress and coercion exerted upon [him]" by law enforcement.  (Mot. to Suppress All Physical Ev. at 1, Doc. No. 15.)  Finally, he contends that the search leading to the discovery of evidence was unlawful.

Similarly, Defendant Gallegos seeks the suppression of evidence found on his person, arguing that there was no arrest warrant and no probable cause for his arrest.  (Mot. to Suppress Ev. Found on Def.'s Person, Doc. No. 48.)

First, as to the lawfulness of the search that led to the discovery of evidence, the Court has determined, for the reasons set forth above, that the search was valid.

As to the lawfulness of the arrests, the standard for arrest is probable cause, defined in terms of facts and circumstances "sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense."  Beck v. Ohio, 379 U.S. 89, 91 (1964). Probable cause may be based on the "collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication."  United States v. Twiss, 127 F.3d 771, 774 (8th Cir. 1997).  In establishing probable cause, police officers

"enjoy substantial latitude in interpreting and drawing inferences from factual circumstances." United States v. Horne, 4 F.3d 579, 589 (8th Cir. 1993), cert. denied, 510 U.S. 1138 (1994). While a bare suspicion of criminal activity is insufficient to establish probable cause, the police need not have enough evidence to justify conviction before making a warrantless arrest. United States v. Morales, 923 F.2d 621, 624 (8th Cir. 1991).

Warrantless searches of arrestees are valid when conducted incident to a lawful custodial arrest. New York v. Belton, 453 U.S. 454, 461 (1981); United States v. Pratt, 355 F.3d 1119, 1124 (8th Cir. 2004). A full search of an arrestee for both weapons and evidence may be made during a search incident to arrest. See United States v. Robinson, 414 U.S. 218, 229 (1973).

Here, officers had more than a "bare suspicion of criminal activity." As noted, Officer Merten testified to having seen Defendant Gallegos conduct a drug transaction at the residence earlier in the day. When officers approached him later, Gallegos turned away from them and displayed a handgun. Probable cause existed to arrest him and officers could lawfully search his person incident to his arrest.

Defendant Lopez was inside the residence where a large quantity of cocaine and loaded firearm were found. Sufficient probable cause existed for his arrest. Defendants' motions to suppress based on unlawful arrest should therefore be denied.

### D.    Suppression of Statements, Admissions and Answers

Defendants seek to suppress all statements, admissions and answers. Both Defendants gave post-arrest, recorded statements. (See, e.g., Defense Ex. 5, Recording of Gallegos's interview.)

First, Defendants argue that their statements should be suppressed because they were unlawfully in custody under the Fourth Amendment.  Thus, they argue, their statements were the product of a constitutional violation and should be suppressed pursuant to Won Sun v. United States, 371 U.S. 471 (1963).  This Court has already concluded that Defendants were lawfully in custody under the Fourth Amendment.  Thus, their fruit of the poisonous tree arguments are unavailing for the reasons discussed herein.

Defendants also challenge the admissibility of any statements under the Fifth Amendment.  The Fifth Amendment privilege against self-incrimination protects individuals from being forced to testify against themselves.  U.S. Const. amend. V.  Miranda warnings must be given before any interrogation of a suspect in custody may take place.  Miranda v. Arizona, 384 U.S. 436, 460-61 (1966).  Before the government may introduce in its case-in-chief an incriminating statement made by a defendant, it must prove a voluntary, knowing and intelligent waiver of the accused's rights under the Fifth Amendment.  Id. at 475.

Under Miranda, custody involves the deprivation of "freedom of action in any significant way."  384 U.S. at 444. To determine whether a person is in custody, a court assesses the objective circumstances of the situation from the perspective of a reasonable person in the suspect's position.  See Berkemer v. McCarty, 468 U.S. 420, 422 (1984).

The record here reflects that each Defendant received a Miranda warning and each waived his rights prior to making their statements.  Moreover, there is no evidence of coercion or promises made to either Defendant in order to extract statements.  The test for determining the voluntariness of a confession is whether the confession was extracted by threats, violence, or direct or implied promises, such that Defendant's "will [was] overborne and his capacity for

self-determination critically impaired." <u>Sumpter v. Nix</u>, 863 F.2d 563, 565 (8th Cir. 1988)

(quotation omitted).  Whether a waiver is coerced involves "two distinct dimensions." <u>Moran v.</u>

<u>Burbine</u>, 475 U.S. 412, 421 (1986).   The relinquishment of one's rights must be (1) voluntary in

the sense that it is "the product of a free and deliberate choice rather than intimidation, coercion,

or deception," and (2)  the waiver must be made with "a full awareness both of the nature of the

right being abandoned and the consequences of the decision to abandon it." <u>Colorado v. Spring</u>,

479 U.S. 564, 573 (1987).   Only if the "totality of the circumstances surrounding the

interrogation reveal both an uncoerced choice and the requisite level of comprehension may a

court properly conclude that the <u>Miranda</u> rights have been waived." <u>Moran</u>, 475 U.S. at 421; <u>see</u>

<u>also</u> <u>United States v. Rohrbach</u>, 813 F.2d 142 (8th Cir. 1987) (totality of the circumstances

includes the tactics used by the police, the details of the interrogation, and any characteristics of

the accused that might cause his will to be easily overborne), <u>cert. denied</u>, 482 U.S. 909 (1987).

There is no evidence that any promises were made to Defendants.  There is no evidence

that the will of Defendants was overborne when they were speaking with the interviewing

officers.  The Supreme Court has held that coercive police activity is a necessary predicate to the

finding that a confession is not "voluntary" within the meaning the Due Process Clause of the

Fourteenth Amendment.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 169-70 (1986).

As to Defendants' Sixth Amendment challenges, the <u>Miranda</u> right to counsel only

attaches when a suspect invokes the right during custodial interrogation by making clear and

unequivocal request for counsel.  <u>See</u> <u>Davis v. United States</u>, 512 U.S. 452, 458-59 (1994)

(holding that defendant's statement, "maybe I should talk to a lawyer," was ambiguous and did

not require officers to clarify); <u>Dormire v. Wilkinson</u>, 249 F.3d 801, 805 (8th Cir. 2001) (finding

no clear invocation of right to counsel because defendant's question, "Could I call my lawyer?" was ambiguous request for counsel), <u>cert. denied</u>, 534 U.S. 962 (2001).  Here, neither Defendant requested an attorney and both waived their rights prior to their respective interviews.

There is simply no evidence that Defendants' statements to law enforcement officers were anything but voluntary.  Both Defendants knowingly and voluntarily waived their <u>Miranda</u> rights.  As such, their motions to suppress their respective statements should be denied.

### E.      Motion to Dismiss the Indictment Based on Entrapment

While giving the Government notice of his intent to raise the defense of entrapment, Defendant Lopez moves the Court for an Order dismissing this case.  (Doc. No. 32.)  Defendant Lopez argues that the Government initiated the criminal conduct and that he was, by persuasion and inducement, lured into the commission of the alleged criminal conduct for which he has been indicted.  <u>Id.</u>  The Government disagrees, arguing that there is no basis for Lopez's claim of inducement, nor has he provided any independent support for his claim.

The Court agrees with the Government.  Defendant Lopez offers no facts in support of this motion.  Rather, the charges against him result from the execution of a search warrant at his residence, the discovery of drugs at his residence and any statements he made as to those drugs. Having offered no evidence in support of his claim of entrapment, the Court recommends that his motion to dismiss be denied.

**THEREFORE, IT IS HEREBY RECOMMENDED that:**

1.    Defendant Gallegos's Motion to Suppress Evidence Obtained as a Result of
Search and Seizure (Doc. No. 47) be **DENIED**;

2.    Defendant Gallegos's Motion to Suppress Evidence Found on Defendant's Person
(Doc. No. 48) be **DENIED**;

3.    Defendant Gallegos's Motion to Suppress Statements, Admissions and Answers
(Doc. No. 49) be **DENIED**;

4.    Defendant Lopez's Motion to Suppress All Statements (Doc. No. 13) be
**DENIED**;

5.    Defendant Lopez's Motion to Suppress Physical Evidence (Doc. No. 15) be
**DENIED**;

6.    Defendant Lopez's Motion to Suppress All Evidence Obtained Pursuant to the
Execution of a Search Warrant (Doc. No. 27) be **DENIED**; and

7.    Defendant Lopez's Motion to Dismiss Based on Entrapment/Notice of Intent to
Raise Defense of Entrapment (Doc. No. 32) be **DENIED**.


Dated: March 31, 2006

                    s/Susan Richard Nelson
                    SUSAN RICHARD NELSON
                    United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by **April 17, 2006,** after being served with a copy thereof.  The objecting party must file with the Clerk of the Court and serve on all parties, written objections which specifically identify the portions of the proposed findings, recommendations, or report to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within ten days after service thereof.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.